# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No. 1:99-cr-10045 |
| v. | ) | & |
| NELSON G. HALLAHAN, | ) | Case No. 1:12-cr-10054 |
| Defendant. | ) | |

## ORDER & OPINION

This matter is before the Court on Defendant Nelson G. Hallahan's Motions for Compassionate Release (Case 99-10045, dkt. 120; Case 12-10054, dkt. 51). Probation has filed a memorandum examining Defendant's proposed release plan. (Case 99-10045, dkt. 126; Case 12-10054, dkt. 56). The Government has responded in both cases (Case 99-10045, dkt. 124; Case12-10054, dkt. 55) and, at the Court's direction, supplemented that response (Case 99-10045, dkt. 128; Case 12-10054, dkt. 58).[1] The Court then took evidence. (Minute Entries Dated 6/29/2020 and 7/13/2020). This matter is therefore ripe for review. For the reasons stated herein, Defendant's motions are denied.

### BACKGROUND

Between 1977 and 1998, Defendant sold insurance and securities; his wife, Janet Hallahan (hereinafter "Co-Defendant") worked with him during the relevant

---

[1] The filings and documentation in these cases are largely duplicative; all further citations are to the documents in Case No. 99-10045 unless otherwise specified.

time. (Dkt. 84 at 6). In 1987, Defendant began to solicit loans from his clients, claiming they were to upgrade his business. (Dkt. 84 at 6). Defendant and Co-Defendant did not use these funds for the business, but rather used the loans for personal use and then, as some loans matured, used later loans to repay earlier loans. (Dkt. 84 at 6). The total money borrowed in this way was $1,287,133.75. (Dkt. 84 at 6). Between 1993 and 1995, Defendant was investigated by the Illinois Securities Department, which resulted in a consent order requiring he not sell securities issuable by him and he repay all loans; some payments were missed despite being reported as paid. (Dkt. 84 at 10).

In 1994, Co-Defendant opened a business called "Sunset Tans, Inc." (Dkt. 84 at 10–11). Defendant solicited money from his clients for Co-Defendant's business, falsely claiming the money would go towards business expenses and that the business was doing "very well." (Dkt. 84 at 10–11). They obtained $600,101.65 in this manner; this money was also used for personal use and to repay prior loans. (Dkt. 84 at 11). In 1995, Defendant also obtained loans from banks under false pretenses. (Dkt. 84 at 16).

On June 23, 1999, Defendant and Co-Defendant were indicted in a 30-count indictment for a variety of financial crimes centered around fraud and money laundering. (Dkt. 117). A superseding indictment was filed on December 15, 1999, which also contained 30 counts, 29 of which Defendant was allegedly responsible for. (Dkt. 118). On January 6, 2000, the Court accepted plea agreements from Defendant and Co-Defendant whereby they pleaded guilty to two counts each; conspiracy to

commit mail and bank fraud and conspiracy to commit money laundering. (Minute Entry Dated 1/6/2000).

On January 17, 2000, Defendant and Co-Defendant failed to contact Probation and report for a presentence investigation interview. (Dkt. 84 at 26). Upon conducting a home visit the next day, Defendant and Co-Defendant's house was discovered to be empty and vacant; a warrant was issued for their arrest on January 19, 2000, and they failed to appear for the sentencing hearing on May 4, 2000. (Dkt. 84 at 27).

Twelve years to the day after their missed sentencing, Defendant and Co-Defendant were profiled on the television show "America's Most Wanted." (Dkt. 84 at 27). An unknown source provided information to the United States Marshal, leading to the discovery that Defendant was living under the assumed name "Andrew Howard Wheeler" in Tonopah, Arizona, working as a handyman for Clyde Harold Clark; Co-Defendant was living under the alias "Diane Lee" and apparently residing with Clark. (Dkt. 84 at 27). Defendant and Co-Defendant were arrested and charged with failure to appear. (Case 12-10054, Dkt. 1). On October 31, 2012, Defendant pleaded guilty to that charge. (Case 12-10054, Minute Entry Dated 10/31/2012).

On November 28, 2012, Defendant and Co-Defendant appeared for a combined sentencing hearing in both cases. (Minute Entry Dated 11/28/2012). Defendant was sentenced to concurrent sentences of 60 months and 210 months on the conspiracy to commit fraud and conspiracy to commit money laundering counts, to be followed by a consecutive 60-month sentence—an upwards variance from the Guidelines—on the failure to appear charge. (Dkt. 109 at 115–16). He was held responsible for

$1,446,114.54 in restitution, jointly and severally with Co-Defendant. (Dkt. 109 at 116). He also received concurrent three-year terms of supervised release. (Dkt. 109 at 116). Defendant and Co-Defendant appealed, but the Seventh Circuit affirmed. (Dkt. 113); *United States v. Hallahan*, 756 F.3d, 962 (7th Cir. 2014), *cert. denied*, 574 U.S. 1000 (2014). The Supreme Court denied a writ of certiorari in Defendant's case in 2014. *Id.*

In 2018, Defendant sought a writ of habeas corpus under 28 U.S.C. § 2241 from the Western District of Missouri. (Case 19-1061, dkt. 4 at 2). It was denied because it should have been brought as a motion under 28 U.S.C. § 2255 in this District; Defendant subsequently filed such a motion. (Case 19-1061, dkt. 4 at 2). He argued his counsel had been ineffective for failing to object to a sentencing enhancement for obstruction of justice and failing to argue his indictment was time-barred. (Case 19-1061, dkt. 4 at 2). The Court denied his motion as untimely and noted he appeared to make a false statement in an attempt to avoid the statute of limitations issue. (Case 19-1061, dkt. 4 at 3–4). From 2018 to 2020, Defendant has repeatedly requested sentence reductions. (Dkt. 124 at 7–8).

Defendant is now 73 years old and suffers from Parkinson's disease, diabetes, hypertension, and end-stage renal disease. (Dkt. 120 at 1). He is a veteran, having been honorably discharged, and he received a Bronze Star and a National Defense Service Medal for his service during the Vietnam War. (Dkt. 120 at 1). He is currently incarcerated at the United States Medical Center for Federal Prisoners in Springfield, Missouri. (Dkt. 124 at 3). The Court understands the only cases of

COVID-19 in that facility have been two inmates who transferred in while sick and were then quarantined. One has already recovered. There is no evidence the disease has spread within the facility.

Defendant's motion is premised upon his medical condition, which he argues would itself be sufficient to warrant compassionate release, and the COVID-19 pandemic, which he states presents a particular danger to him in light of his medical condition and age. If released, he would live with his sister, Tracy Matterson-Stolz, in New Mexico, a plan Probation finds suitable. (Dkt. 126).

## LEGAL STANDARD

The First Step Act of 2018 amended 18 U.S.C. § 3582(c)(1)(A) to allow defendants to ask the sentencing court for compassionate release. Pub. L. No. 115-391 § 603(b), 132 Stat. 5194, 5239. The compassionate release statutory scheme also incorporates a policy statement issued by the United States Sentencing Commission, U.S.S.G. § 1B1.13. *See* 18 U.S.C. § 3582(c)(1)(A) (requiring any reduction be "consistent with applicable policy statements issued by the Sentencing Commission"); 28 U.S.C. §§ 994(a)(2)(C), (t) (requiring the Sentencing Commission to promulgate the relevant policy statement). Between statutory requirements and the policy statement, there are four relevant inquiries when a defendant moves for compassionate release.

First, a defendant may not bring a compassionate release motion until the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days

5

from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Some courts have held this requirement may be waived, *e.g.*, *United States v. Coles*, ___ F. Supp. 3d ___, No. 18-CR-20254, 2020 WL 1899562, at *4 (E.D. Mich. Apr. 17, 2020), while others have held it may not, *e.g.*, *United States v. Albertson*, No. 116-CR-00250, 2020 WL 1815853, at *2 (S.D. Ind. Apr. 8, 2020). The undersigned has yet to decide that question.

Second, the defendant must either be at least 70 years of age and have served 30 years of the sentence for which the defendant is currently imprisoned, 18 U.S.C. § 3582(c)(1)(A)(ii), or demonstrate "extraordinary and compelling reasons warrant" compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). The policy statement sets forth four circumstances which constitute "extraordinary and compelling reasons": (A) the defendant's medical condition; (B) the defendant's age; (C) the defendant's family circumstances; and (D) "other reasons" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13 cmt. n.1. The undersigned has determined the commentary to the Sentencing Commission's policy statement remains binding as to its definition of extraordinary and compelling circumstances, despite being outdated. *United States v. Garcia*, ___ F. Supp. 3d ___, No. 4:05-CR-40098, 2020 WL 2039227, at *5 (C.D. Ill. Apr. 28, 2020).

Third, the court must determine "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Fourth and finally, the Court must consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).

6

**DISCUSSION**

Defendant has exhausted his remedies with BOP. (Dkt. 124 at 24). Although the Government originally contested Defendant's showing of extraordinary and compelling reasons warranting compassionate release (dkt. 124 at 26), in its supplemental response the Government reversed position (dkt. 128 at 2–3). Specifically, the Government conceded some of Defendant's conditions coupled with the danger presented by the COVID-19 pandemic presented extraordinary and compelling reasons for release. (Dkt. 128 at 5). The Court continues to have reservations about the merits of this argument, particularly in light of the Government's assertions regarding the sufficiency of the procedures BOP has put in place to prevent the spread of COVID-19. (*See generally* dkt. 124 at 20–21). But, the Court will accept the Government's concession. Although neither party discusses the third requirement in detail, the Court finds Defendant would not present a danger to any other person or the community; his age and his medical condition make it unlikely he would have the ability to commit crimes even if he were so inclined, and his sister's generosity in providing accommodations should remove any pecuniary motive. Thus, this case turns upon the analysis of the factors set forth in 18 U.S.C. § 3553(a).

Militating in favor of Defendant's release is his medical condition. It is doubtlessly serious. The Court finds Defendant's conditions, particularly his Parkinson's disease and essential tremor, interfere with his life. The evidence adduced at the hearing demonstrates Defendant cannot button his own clothes or

feed himself where motor coordination is necessary, although prison staff may aid in these functions. He cannot walk more than short distances without a walker, but with a walker he appears fully ambulatory. He is able to use toilet facilities by himself, though with some difficulty. His speech is also impacted, causing his voice to be quiet and shaky. All medical testimony established his condition is unlikely to improve—to the contrary, the Court finds his condition will worsen, likely rapidly. Any person would be moved to sympathy in view of Defendant's medical conditions; it certainly cuts in favor of release. Additionally, as discussed above, the Court does not believe Defendant is a serious risk to reoffend, so a reduction would not place the public at risk of further crime committed by him.[2]

Militating against Defendant's release are the nature and circumstances of his offenses, the need for general deterrence, and the need to promote respect for the law.[3] His offenses also reflect poorly on his character. Defendant argues "he has

---

[2] Defendant argues Co-Defendant's release to home confinement pursuant to § 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281, at 516 (2020), also weighs in his favor due to the need to punish like offenders similarly. The Court disagrees. For one thing, her sentence was not reduced, but rather her place of incarceration became home; Defendant is requesting a reduction. For another, Defendant was found the more culpable of the two and sentenced to a longer term of imprisonment. And, the decision to place Co-Defendant on home confinement was made by the Executive rather than the Judicial Branch; there were different considerations at issue. In sum, the decision does not weigh in Defendant's favor. But even if it did, it would be outweighed by the factors discussed *infra*.

[3] The Court does not find the COVID-19 pandemic weighs particularly strongly either in Defendant's favor or against him. Defendant is incarcerated at a medical center, which appears to have had success in controlling COVID-19 within its walls at this time. It is unclear whether release would place him at less risk of contracting COVID-19—on the one hand, he would be more in control of his protection, but on the other, his ongoing need for kidney dialysis would require him to come into contact with

8

attempted to show the Court that his criminal conduct and flight were out of character when viewed through the long lens of his life." (Dkt. 120 at 29). But this ignores the duration of his criminal conduct; at least 11 years of bilking his clients followed by 12 years as a fugitive, evading justice. The long lens of his life reflects that of his 73 years, 23 (nearly a third) were spent actively committing crimes or interfering with the administration of justice, with 8 of the remaining years reflecting his incarceration. It suggests he is a law-abiding and respecting citizen only when the coercive power of the state forces him to be.

The nature and circumstances of his offenses are also egregious. It is true Defendant has not committed violent offenses, but his frauds caused grievous injury all the same. He targeted people who placed their trust in him and took their money for his own personal gain. He was given a chance to reform without criminal punishment—generously—which he used to start a new scam to enrich himself. Then, when it appeared his victims would finally see justice, he attempted to deprive them of that by absconding. As the Seventh Circuit put it, "[n]ot only did [he] fail to accept responsibility, [he] escaped responsibility." *United States v. Hallahan*, 756 F.3d 962, 981 (7th Cir. 2014). In sum, Defendant flouted the law until it seemed a new tool he could use to avoid the consequences of his actions.

The need for general deterrence and to promote respect for the law, in particular, weigh strongly against Defendant. Fugitives run from the law in the hope

---

others fairly frequently. Thus, even though the Court recognizes the risk Defendant's conditions place him at from COVID-19, the Court cannot say it supports his release.

9

they will be able to outrun it. This can be accomplished by living out their natural life one step ahead of justice, as Defendant attempted to do. "[T]he law's deterrent and retributive effect can be maintained, in the event of prolonged fugitive status, only by substantial incremental penalties." *Id.* at 982 (quoting *United States v. Elliot*, 467 F.3d 688, 692 (7th Cir. 2006)). If the Court were to release Defendant now, he would not serve a single day of the sentence for failure to appear. Indeed, he would avoid much of his sentence for the fraud and money laundering convictions as well. And he would do so by turning to the law for its protection after defying it for nearly a quarter of a century. Release might signal to other criminals that if they run far enough and fast enough for long enough, they may have the opportunity to ultimately serve a *shorter* sentence. It would suggest that one who disrespects the law by enriching himself unlawfully and fleeing the consequences may avail himself of its softer side to avoid responsibility. That cannot be; the sentence must promote respect for the law.

The through line here is a Defendant eager to avoid repaying his debt to society and willing to turn to the law only when it advantages him. Though the Court feels compassion for Defendant's medical condition, he is presently receiving appropriate treatment, including assistance in performing the daily activities which his tremors make difficult; the evidence adduced also indicates BOP can provide further acceptable care if and when it becomes necessary. In light of Defendant's pervasive disrespect for the law unless it benefits him and BOP's demonstrated ability to provide the necessary medical and non-medical assistance to minimize the impact

Defendant's conditions have on his life, compassionate release is inappropriate at this time. There will likely come a day when this balance will tip in the other direction, and Defendant's medical condition will have deteriorated to such a point that even with the help BOP can provide, the cruelty of keeping him imprisoned will outweigh the other purposes of sentencing. But based on the Court's findings regarding the present state of his condition, that day has not yet come.

That Defendant is elderly and spending years of declining health incarcerated is something for which he has only himself and his disrespect for the law to blame. If Defendant had faced justice and accepted responsibility twenty years ago, he would have already been released, even presuming he would have received the same 210-month sentence.[4] He chose to spend 12 years hale and hearty as a fugitive; the cost is spending time infirm and incarcerated.

## Conclusion

Defendant Nelson G. Hallahan's Motions for Compassionate Release (Case 99-10045, dkt. 120; Case 12-10054, dkt. 51) are DENIED.

SO ORDERED.

Entered this 21st day of July 2020.

s/ Joe B. McDade<br>
JOE BILLY McDADE<br>
United States Senior District Judge

---

[4] And it is unlikely he would have received 210 months on those counts; that sentence was based upon guidelines including an enhancement for failure to appear and without a reduction for acceptance of responsibility. Absent the enhancement and with the reduction, he likely would have received a shorter sentence for the conspiracy convictions.